STEVEN G. KALAR
Federal Public Defender
Northern District of California
HANNI M. FAKHOURY
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:    (510) 637-3507
Email:        Hanni_Fakhoury@fd.org

Attorneys for Donald Gregory Murray, Jr.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DONALD GREGORY MURRAY, JR.,<br><br>Defendant. | **Case No.:** 4:20-mj-71869-MAG<br><br>**DEFENDANT'S OPPOSITION TO UNITED STATES' MOTION TO REVOKE PRE-TRIAL RELEASE ORDER**<br><br>**Court:**          Courtroom 4, 5th Floor<br>**Hearing Date:**  January 5, 2021<br>**Hearing Time:**  2:00 p.m. |

1

**INTRODUCTION**

2    After a contested detention hearing, the Honorable Sallie Kim determined that Mr. Murray

3    could be released on an unsecured $25,000 appearance bond, co-signed by his girlfriend, and under

4    stringent conditions, including the requirement that he reside at the San Francisco Residential

5    Reentry Center ("RRC").  The government now asks this Court to revoke Judge Kim's thoughtful

6    pre-trial release order. *See* Dkt. 7, United States' Motion to Revoke Pre-Trial Release Order ("Gov.

7    Mot.").  As detailed below, the government's request should be denied.

8

**STATEMENT OF FACTS**

9    A.    **Mr. Murray's History and Character.**

10    Mr. Murray was born in 1998, and is 22 years old.  He has lived in Oakland his whole life with

11    his family, including his parents and younger sisters. He graduated high school in 2017 and most

12    recently worked at a shoe store in Oakland, as well as for his uncle's moving company. He has a one

13    year old son, who he supports financially and has daily contact with.

14    Mr. Murray started finding himself in trouble—and jail—when he was 15 years old.  He

15    suffered convictions for property and firearms offenses, though he has never been arrested or

16    convicted of a violent crime or drug trafficking. Mr. Murray served short stints in the Alameda

17    County jail, and was never sent to state prison.

18    Despite his previous troubles, Mr. Murray's current Alameda County Probation officer reported

19    that Mr. Murray "was performing well under her supervision," although "his supervision

20    requirements were minimal due to COVID-19." *See* Pre-Bail Report at 7. At the time of his arrest in

21    the federal case, he had no pending warrants or detainers. *Id.*

22    B.    **The Federal Case and Detention Hearing.**

23    On December 17, 2020, a complaint was filed charging Mr. Murray with being a felon in

24    possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). *See* Dkt. 1. According to the complaint,

25    ATF agents monitoring Mr. Murray's Instagram page found pictures of what appeared to be him

26    holding firearms. A search warrant was executed at his home in Oakland, and police recovered

27    additional firearms and ammunition from a backpack inside the house.

28

1    Mr. Murray made his initial appearance on December 18, 2020, and the government requested

2 Mr. Murray be detained as both a flight risk and a danger to the community. He was remanded into

3 custody pending a detention hearing. *See* Dkt. 4. Pretrial Services prepared a bail report, interviewing

4 Mr. Murray, his parents, his proposed surety, the case agent and his Alameda County probation

5 officer. Pretrial Services concluded that contrary to the government's position, release conditions

6 could mitigate against any flight risk. But Pretrial Services nonetheless recommended Mr. Murray be

7 detained as a danger to the community.

8    At the detention hearing held on December 29, 2020, Judge Kim ordered Mr. Murray released

9 on a $25,000 unsecured bond co-signed by his girlfriend, Terrell Knox, on the condition that he

10 reside at the San Francisco halfway house, which had one bed available. Judge Kim stayed the

11 release order to allow the government the opportunity to appeal the release order, which it did later

12 that day. *See* Dkt. 6, 7. This Court stayed the release order that same day pending a hearing on the

13 government's motion. *See* Dkt. 8.

14 **ARGUMENT**

15    The Bail Reform Act mandates release of a person pending trial unless a court finds the person

16 a flight risk or a danger to the community.  18 U.S.C. § 3142(b).  The court must impose "the least

17 restrictive further condition, or combination of conditions" it "determines will reasonably assure the

18 appearance of the person as required and the safety of any other person and the community."  18

19 U.S.C. § 3142(c)(1)(B).  The government bears the burden of proving by clear and convincing

20 evidence that a defendant poses a flight risk or a danger to the community that cannot be mitigated

21 through the imposition of conditions of release.  Close cases should result in a defendant's release.

22 *United States v. Motamedi*, 767 F.2d 1403, 1405-06 (9th Cir. 1985).

23    Even if a person is deemed a danger or a flight risk, they "must still be released if there is a

24 'condition or combination of conditions that will reasonably assure" the appearance of the person and

25 the safety of the community.  *United States v. Hir*, 517 F.3d 1081, 1091-92 (9th Cir. 2008) (quoting

26 18 U.S.C. § 3142(e)).  The Bail Reform Act "contemplates only that a court be able to 'reasonably

27 assure,' rather than guarantee" the appearance of the person and safety of the community.  *Hir*, 517

28 F.3d at 1092 n. 9.

Abandoning its initial claim that Mr. Murray is a flight risk, the government asks this Court to revoke Mr. Murray's release because it believes he is a danger to the community. As explained below, its request should be denied and Judge Kim's decision releasing Mr. Murray on the condition that he reside at the San Francisco halfway house affirmed.

A.   **The § 3142(g) Factors Support Releasing Mr. Murray.**

The Bail Reform Act directs courts to consider several factors in determining whether a person should be released.  *See* 18 U.S.C. § 3142(g).  Those factors are: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community posed by the person's release.  *Hir*, 517 F.3d at 1086; *see also* 18 U.S.C. § 3142(g).  These factors weigh in favor of releasing Mr. Murray.

1.   **Nature and Circumstances of the Offense.**

Mr. Murray is charged with being a felon in possession of a firearm which is undoubtedly a serious crime.  But it is not a "crime of violence" under the law, and does not trigger a rebuttable presumption that a defendant should be detained.  *See* 18 U.S.C. § 3142(e)(3).  A cursory calculation of the United States Sentencing Guideline range the government provided to Mr. Murray indicates that he is looking at a potential custodial sentence far below the ten year statutory maximum.

2.   **The Weight of the Evidence.**

The government argues "the weight of the evidence against [Mr. Murray] is overwhelming." Gov. Mot. at 5.  But "the weight of the evidence is the least important of the various factors."  *Hir*, 517 F.3d at 1090 (internal quotations and citations omitted).  The Bail Reform Act "neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

Most critically, the weight of the evidence was known to Judge Kim at the bail hearing, who had reviewed the complaint and seen the pictures included in the government's filing before this Court.  Yet she determined there were release conditions that could mitigate against any perceived danger to the community.  Nothing the government has presented before this Court changes that conclusion.

### 3. Mr. Murray's History and Characteristics.

The Bail Reform Act lists several specific characteristics about Mr. Murray this Court must consider in deciding whether he should be released. *See* 18 U.S.C. § 3142(g)(3)(A).

Mr. Murray's character: Mr. Murray will be the first to admit he has made mistakes. He also understands he is now at a fork in his young life. He has never been prosecuted by the federal government before, never had law enforcement scrutinizing his social media feeds, and never faced the possibility of going to prison, and not just serving a "prison sentence" in the county jail. This case is a wakeup call that he must either change his ways to salvage a productive, law abiding life, or go through a revolving jail door, each sentence getting longer and longer. Mr. Murray wants to change and is eager to take advantage of the resources available to him through Pretrial Services, which will be more stringent than the supervision he previously received through the state court system. Coupled with the facts he has a young son he sees daily and that his girlfriend has placed herself at significant financial risk by agreeing to serve as a surety, Mr. Murray has enough incentives to comply with the release conditions and stay out of trouble.

Mr. Murray's Mental Condition: It is clear that Mr. Murray struggles with his decision making. Releasing Mr. Murray and allowing him to participate in Pretrial Services cognitive behavioral programming like Courage to Change, mitigates any concerns over dangerousness by giving him the help he needs to make better decisions. Locking him up in jail will not give Mr. Murray any opportunities to work through his decision making, particularly with limited programming opportunities at Santa Rita jail due to the COVID-19 pandemic.

Family and Community Ties: Mr. Murray is a lifelong resident of the Bay Area and has family in the area, including his young son, which ensures he is unlikely to flee. Mr. Murray's problems likely come with his neighborhood affiliations in Oakland. Judge Kim addressed those concerns by ordering Mr. Murray to reside at the San Francisco RRC, ensuring he is out of the city that has given him problems in the past, and living under the strictures of a halfway house instead of his parents' house.

Employment and Financial Resources: Mr. Murray is a high school graduate and has worked at a shoe store in the past. If released, he hopes to find work, and may be able to work for his uncle's

moving company as he has done previously. He has limited financial resources and does not have the ability or incentive to flee.

Past conduct: Again, Mr. Murray acknowledges he has made mistakes, which has now culminated in a federal prosecution.  But his past conduct is more than just his rap sheet and the facts of the new arrest as detailed by the government in its motion.  Taking Mr. Murray out of Oakland and requiring him to participate in cognitive behavioral treatment through Pretrial Services mitigates any risk Mr. Murray will commit the same kinds of mistakes that have landed him in federal court.

Drug and alcohol abuse: Mr. Murray has smoked marijuana in the past but has otherwise minimal drug use. He understands that although marijuana is legal under California state law, it is still illegal under federal law and that using it will be a violation of his pretrial release. Any concerns over drug use can be mitigated by requiring Mr. Murray regularly tests and receives treatment if deemed necessary by Pretrial Services.

Criminal history: This is Mr. Murray's first federal offense.  His longest previous jail sentence was a 16 month "paper" prison commitment, meaning he served his sentence—which amounted to only eight months of actual custodial time—in the Alameda County jail. He has no arrests or convictions for violent crimes or drug trafficking, and has never served time in prison.

Appearance record at court proceedings: Mr. Murray has no arrests or convictions for failures to appear and the government is not arguing before this Court that Mr. Murray is a flight risk.

### 4. Danger to the Community.

Mr. Murray is not a danger to the community.  No doubt, the increase in violent crime in Oakland noted by the government in this challenging year is horrific and tragic. But Mr. Murray has nothing to do with that. He has never been arrested or convicted of a violent offense like assault with a firearm.  There is no allegation by the government whatsoever that any of the weapons allegedly possessed by Mr. Murray in this case were used in a violent crime, whether by Mr. Murray or someone else. And most importantly, Judge Kim correctly concluded that conditions of release could be fashioned to mitigate any danger, including requiring Mr. Murray to reside in the San Francisco RRC and away from Oakland.

1    The government complains that the RRC "is not a secure facility" and "residents of the facility

2    can leave any time they want."  Gov. Mot. 10.  But again, the Bail Reform Act "contemplates only

3    that a court be able to 'reasonably assure,' rather than guarantee" the appearance of the person and

4    safety of the community.  *Hir*, 517 F.3d at 1092 n. 9.  The government's position would ultimately

5    mean no defendant would ever be released from custody, a scenario completely at odds with the

6    purpose and structure of the Bail Reform Act.

7        In any event, any concerns about the halfway house are better mitigated by placing additional

8    conditions—such as requiring Mr. Murray wear an ankle monitor, abide by a curfew, or reside in the

9    RRC on "lockdown"—rather than outright revoking Mr. Murray's release altogether.

10   **B.    The Proposed Surety is Adequate.**

11       The government argues that the surety, Mr. Murray's girlfriend, is inadequate because it

12   believes she "has neither the necessary assets nor sufficient moral suasion" over Mr. Murray.  *See*

13   Gov. Mot. at 10. Ms. Knox earns approximately $17 an hour providing in home health care services.

14       To the extent the government opposes Ms. Knox as a surety because it believes she is insolvent,

15   that argument is a total nonstarter. As an initial matter, by not raising this issue before Judge Kim at

16   the detention hearing, the government has waived the argument.  *See Ruiz v. Affinity Logistics Corp.*,

17   667 F.3d 1318, 1322 (9th Cir. 2012) ("an issue will generally be deemed waived on appeal if the

18   argument was not raised sufficiently for the trial court to rule on it.") (internal quotations and

19   citations omitted).

20       Even if the argument was preserved, this Court should reject it.  Several judges of this district,

21   including District Judges Wilken[1] and Jensen[2], and Magistrate Judges Beeler[3], Ryu[4] and

22   Zimmerman[5], have already rejected the argument. Their reasons for doing so are clear from the text

23   of the Bail Reform Act.

24

25   [1] *United States v. Powell*, CR 10-292-CW, Dkt. 41.

26   [2] *United States v. Cruz*, CR 09-1157-DLJ, Dkt. 30.

27   [3] *United States v. Cruz*, CR 09-1157-DLJ, Dkt. 24.

28   [4] *United States v. Powell*, CR 10-292-CW, Dkt. 18, 2010 WL 2557388 (N.D. Cal. Jun. 21, 2010).

     [5] *United States v. Thomas*, CR 09-363-SBA, Dkt. 9, 615 F.Supp.2d 1083 (N.D. Cal. April 21, 2009).

1    Section 3142(c)(1)(B)(xii), the provision of the Bail Reform Act cited by the government, does

2    not *require* a solvent surety with a net worth equal to the amount of the bond.  *See* Gov. Mot. at 10.

3    Section 3142(c)(1)(B) authorizes a court to release a person from custody on conditions "which *may*

4    include" a number of conditions, including a solvent surety.  "The word 'may' is permissive, not

5    mandatory." *Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993).  So while the Bail Reform Act

6    authorizes a magistrate judge to demand a solvent surety with sufficient assets to cover the entire

7    amount of the bail before releasing a person, the Act does not "require[]" it as the government

8    mistakenly claims.  *See* Gov. Mot. at 10.[6]

9    Interpreting the Bail Reform Act to require a solvent surety with sufficient assets to cover the

10   amount of the bond is not only unsupported by its clear text, it would explicitly contradict other

11   provisions of the Act.  As Magistrate Judge Ryu noted more than ten years ago when the government

12   last tried this unconvincing argument

13        The government's position, taken to its logical conclusion, is that defendants who pose
           a flight risk that is mitigable with an appearance bond can never be released if they
14         cannot identify someone in their life with significant and identifiable assets. Under the
           government's interpretation, people who do not have immediate access to material
15         wealth of their own—or through their friends and family—in many circumstances
           simply will not have a meaningful shot at pretrial release.
16

17   *United States v. Powell*, 2010 WL 2557388, at *2 (N.D. Cal. June 21, 2010).  Such an interpretation

18   of the Bail Reform Act would undermine its command that a judge impose "the least restrictive"

19   release conditions.  18 U.S.C. § 3142(c)(1)(B).  It contradicts the Act's mandate that a "judicial

20   officer may not impose a financial condition that results in the pretrial detention of the person."  18

21   U.S.C. § 3142(c)(2). And it renders irrelevant the "catch all" provision in 18 U.S.C. §

22   3142(c)(1)(B)(xiv), which allows a judge to release a person on "any other condition" deemed

23   necessary to secure a person's appearance and the safety of the community.  Most problematic, the

24   government's position triggers significant Constitutional concerns by effectively foreclosing pretrial

25

26   _____

27   [6] If the government's intent in seeking a surety with enough assets to cover the entire amount of the
     bond is to ensure it can collect on the bond should Mr. Murray violate the conditions of his release,

28   "the Bail Reform Act of 1984 nowhere authorizes consideration of the government's ability to collect
     on security" and so "this concern is not a proper basis for imposing a further restrictive condition" on
     a person's release."  *United States v. Frazier*, 772 F.2d 1451, 1453 (9th Cir. 1985).

release to indigent defendants like Mr. Murray.  *See Bandy v. United States*, 81 S. Ct. 197, 198 (1960) (noting "it would be unconstitutional to fix excessive bail to assure that a defendant will not gain his freedom" and "[y]et in the case of an indigent defendant, the fixing of bail in even a modest amount may have the practical effect of denying him release."); *see also Buffin v. San Francisco*, CV 15-04959-YGR, 2019 WL 1017537, at *12 (N.D. Cal. Mar. 4, 2019) (citing "studies conclud[ing] that the system of money bail in the United States discriminates against indigent detainees who lack the financial resources to post bail.").

"Ultimately, the function of bail is not to purchase freedom for the defendant but to provide assurance of his reappearance after release on bail."  *United States v. Melville*, 309 F. Supp. 824, 826 (S.D.N.Y. 1970). The $25,000 unsecured appearance bond is a significant financial impediment on Mr. Murray's girlfriend that will encourage him to appear in court and comply with the terms of his release. Coupled with the requirement he live at an RRC and be intensively monitored by Pretrial Services, any concerns about community safety are adequately mitigated.  Judge Kim's release order should be affirmed.

## **CONCLUSION**

For these reasons, this Court should affirm Judge Kim's order allowing Mr. Murray to be released from custody.


Dated:     December 31, 2020                    Respectfully submitted,

                                               STEVEN G. KALAR
                                               Federal Public Defender

                                                    /S
                                               HANNI M. FAKHOURY
                                               Assistant Federal Public Defender