MOEEL LAH FAKHOURY LLP
Hanni M. Fakhoury (State Bar No. 252629)
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: (510) 500-9994
Email: hanni@mlf-llp.com

Attorneys for Donald Murray, Jr.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DONALD MURRAY, JR.,<br><br>　　　　　Defendant. | **Case No.:** 4:21-CR-00032-HSG<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>**Court:**　　　Courtroom 2, 4th Floor<br>**Hearing Date:**　July 7, 2021<br>**Hearing Time:**　10:00 a.m. |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................... 1

STATEMENT OF FACTS .................................................................................................................. 1

    A.    Mr. Murray's History and Characteristics. ............................................................... 1

    B.    The Nature and Circumstances of the Offense Court Proceedings. ................... 2

    C.    Mr. Murray's Performance on Pretrial Release. ..................................................... 3

    D.    Mr. Murray's Future Plans and Goals. ..................................................................... 3

SENTENCING ARGUMENT ............................................................................................................. 4

    A.    Seriousness of the Offense, Respect for the Law and Just Punishment. ............ 4

    B.    Deterring Criminal Conduct and Protecting the Public. ........................................ 6

        1.    Prosecuting this case in federal court serves as general deterrence. ........ 6

        2.    Mr. Murray's post offense rehabilitation demonstrates he has been deterred. ................................................................................................................ 7

        3.    Two judges have already determined Mr. Murray is not a danger to the public. ........................................................................................................ 8

    C.    Providing Training, Medical Care or Other Treatment. ........................................ 9

    D.    The Guidelines Sentencing Range. .......................................................................... 9

    E.    Avoiding Unwarranted Sentencing Disparities. .................................................... 11

    F.    Mr. Murray Does Not Have the Means to Pay a Fine. ......................................... 13

CONCLUSION .................................................................................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................................. 4, 5, 7, 11

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ................................................................................. 5

*Pepper v. United States*, 562 U.S. 476 (2011) ............................................................................. 7, 9

*Tapia v. United States*, 564 U.S. 319 (2011) ............................................................................... 5

*United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ............................................ 11

*United States v. Bad Marriage*, 392 F.3d 1103 (9th Cir. 2004) .................................................. 9

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) .............................................................. 4

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) .................................................. 4

*United States v. Robinson*, 20 F.3d 1030 (9th Cir. 1994) ............................................................ 14

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) .................................................................... 7

*United States v. Trujillo*, 713 F.3d 1003 (9th Cir. 2013) ............................................................. 7

*United States v. Vasquez*, 160 F.3d 1237 (9th Cir. 1998) ............................................................ 5

*Williams v. New York*, 337 U.S. 241 (1949) ................................................................................ 4

## Statutes

18 U.S.C. § 922 ............................................................................................................................. 2

18 U.S.C. § 3142 ........................................................................................................................... 8

18 U.S.C. § 3553 ................................................................................................................... *passim*

18 U.S.C. § 3565 ........................................................................................................................... 5

18 U.S.C. § 3572 ........................................................................................................................... 13

## U.S. Sentencing Guidelines ("U.S.S.G.")

U.S.S.G. § 2K2.1 .......................................................................................................................... 9, 10, 11

U.S.S.G. § 3E1.1 ........................................................................................................................... 9

U.S.S.G. § 5E1.2 ........................................................................................................................... 14, 15

U.S.S.G. § 5H1.1 .......................................................................................................................... 10

## Other Authorities

Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017 ........................................................................................................................ 6

Baber, et al., "A Viable Alternative? Alternatives to Incarceration Across Seven Federal Districts," *Federal Probation* Vol. 83, no. 1 (Jun 2019) ............................................... 8

Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019 ............................................................ 6

U.S. Sentencing Commission, "Youthful Offenders in the Federal System," May 2017 .................... 10

# INTRODUCTION

Unless something changed, Donald Murray, Jr. was likely to end up a victim of gun violence, like his half-brother before him, and like so many young men in Oakland since, particularly over these last few difficult months. Surrounded by violence, Mr. Murray—like many young men from his neighborhood—felt he needed a firearm to protect himself in the rough and tumble streets of East Oakland. Like many of the people he grew up with, Mr. Murray was living life on an installment plan, cycling through the revolving door of juvenile hall and then county jail. He finds himself, 23 years old, in federal court, awaiting sentencing and staring at the possibility of going to prison for the first time in his life.

This case has been that change. More specifically, given the chance by two judges to be released from custody, he has excelled on pretrial release over the last four months. One of the conditions of his release was the deliberate decision to require Mr. Murray to live in the halfway house in San Francisco, away from Oakland.

As Mr. Murray writes in his letter to the Court, he understands "what I did was wrong." Exh. A. But he also notes "I have changed in these few months," and "I am not the same person I was in December." *Id.* He has obeyed all the rules of the halfway house and the conditions of his pretrial release, and as a result has earned back his freedom gradually. Today, he is a husband, a student, and an employee, thinking of his future for the first time, one that may take him away from Oakland in exchange for a better life.

Given these positive strides, Mr. Murray respectfully requests this Court sentence him to five years of probation or, alternatively, to defer sentencing for six months so he can continue "to prove to the Court and anyone who doubts me that people can change." *Id.*

# STATEMENT OF FACTS

A.  **Mr. Murray's History and Characteristics.**

Mr. Murray was born in Oakland in 1998. Presentence Investigation Report ("PSR") ¶ 49. As Mr. Murray writes in his letter, "although my household was loving and caring, the neighborhood and apartments that I lived in were not," and he "was exposed to violence at an incredibly young age." Exh. A. Mr. Murray lived in a housing project with 26 units in East Oakland; many of the residents

were "gang members and pimps." PSR ¶ 54. When he saw someone shot at the age of 7, he felt it was "normal because I always seen people hurting people in my neighborhood." *Id.* His "older cousins were always engaged in drug activity and gang violence, and I was right alongside them thinking the stuff they did was cool." *Id.*

When he was 8, his paternal half-brother was shot and killed at the age of 24. As his mother noted in a juvenile probation report, she could see that the loss of his half brother affected Mr. Murray but he did not want to talk about it. PSR ¶ 61.[1] By the time he was 10, Mr. Murray began to skip school and primarily spent his day smoking marijuana with other kids in the neighborhood. Mr. Murray explains at the time, "watching it made me think certain stuff was ok that I know now is not." Exh. A. Predictably, Mr. Murray found himself caught up in the juvenile court system, sent to group homes and, when he became an adult, finding himself serving short stints in the Alameda County jail. He became a father when he was 20 years old, his son born while he was incarcerated. PSR ¶ 59.

**B.    The Nature and Circumstances of the Offense Court Proceedings.**

On December 17, 2020, a criminal complaint was filed charging Mr. Murray with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. ATF agents monitoring Mr. Murray's Instagram page found pictures of what appeared to be him holding firearms. A search warrant was executed at his home in Oakland, and police recovered firearms and ammunition from a backpack inside the house. Unfortunately, like a lot of the young men exposed to violence in East Oakland, Mr. Murray felt he needed a firearm for protection.

Mr. Murray made his initial appearance on December 18, 2020, and the government requested Mr. Murray be detained as both a flight risk and a danger to the community. He was remanded into custody pending a detention hearing. PSR ¶ 4. On December 29, 2020, the Honorable Sallie Kim ordered Mr. Murray released from custody once a bed at an RRC was available. *Id*. The Honorable Edward J. Davila affirmed that decision on January 5, 2021. *Id*. On March 5, 2021, once a bed was available, Mr. Murray appeared before the Honorable Susan van Keulen, who released him on a $25,000 appearance bond, with his girlfriend (now wife) Terrell Knox serving as a surety, on the

---

[1] The PSR references a 2015 Alameda County juvenile probation report. The probation officer allowed undersigned defense counsel to review the report via Zoom screenshare.

condition he reside at the San Francisco halfway house on lockdown and be subject to GPS monitoring. PSR ¶ 5. He entered an open plea before this Court on March 24, 2021. PSR ¶¶ 2-3.

C. **Mr. Murray's Performance on Pretrial Release.**

Since his release to the halfway house on March 5, 2021, Mr. Murray has excelled. He has complied with all the rules set by Pretrial Services and the halfway house and has not had a single positive drug test. As a result, he has slowly gained back some of his freedom. On April 8, 2021, the condition of GPS monitoring was removed upon stipulation of the parties. PSR ¶ 6. On May 11, 2021, his release conditions were again modified by stipulation to give Mr. Murray the opportunity to leave the halfway house for a full day to marry Ms. Knox, which took place on his 23rd birthday, May 25, 2021. *See* Dkt. 37. Finally, on June 10, 2021, the Honorable Donna M. Ryu modified Mr. Murray's bond conditions to allow him to leave the halfway house for employment. Mr. Murray found a job as a general laborer for Faith Ova Fear LLC, a company that provides landscaping and other construction related services in the Bay Area. PSR ¶ 81. Mr. Murray was assigned to work at the Cosmopolitan Baptist Church in San Francisco. *Id.*



Mr. Murray at work

D. **Mr. Murray's Future Plans and Goals.**



Mr. Murray's marriage certificate

Mr. Murray has "never been this focused in my life." Exh. A. "Being given the chance to be in this halfway house has gave me a real spark of reality, especially awaiting to be sentenced in a federal jail for who knows how long." *Id.* He realizes the old friends from the neighborhood were not looking out for his best interest and there is "way more to life." *Id.* He had never dreamed of getting married or going to college, but he has done both, marrying Terrell on May 25,

2021, and enrolling in Trident University, an online school where he is hoping to earn a business degree. PSR ¶ 79. As his wife Terrell writes to the Court, she "love[s] the man he is becoming." Exh. B. She notes he "is actually taking the initiative by backing up what he says by making progress. He says one thing than he does it and move to the next." *Id.* She notes Mr. Murray recognizes "the life he was living would only bring death or jail" and she is "very proud of him for realizing that and doing what it takes to change that." *Id.*

Mr. Murray's success has been due, in part, to the fact he is out of Oakland, released only to the San Francisco halfway house, and working a job site in San Francisco. Both his wife and his mother told the probation officer they believe Mr. Murray would benefit from leaving Oakland and he agrees, hoping to eventually relocate to Stockton with Terrell. PSR ¶¶ 62-64.

## SENTENCING ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the U.S. Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Mr. Murray asks this Court to sentence him to five years of probation or, alternatively, defer sentencing for six months to give him an opportunity to continue demonstrating he is a changed man who has put his previous lifestyle behind him.

**A.   Seriousness of the Offense, Respect for the Law and Just Punishment.**

The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the offense," the need "to promote respect for the law" and "provide just punishment for the offense"—

are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008). Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

Mr. Murray's federal felony conviction, three months in the Santa Rita jail at the height of the pandemic, three months in the halfway house, and the fact he will be supervised by the Probation Office or Pretrial Services for the foreseeable future are all harsh consequences for his foolish actions. While Mr. Murray has not lived a crime free life, the longest jail sentence he has ever served was approximately 8 months in the county jail when he was 20 years old. PSR ¶¶ 37. Mr. Murray has never been to state prison or placed on parole.

A five-year probation sentence—or deferring sentencing for six months—following these restrictions on his liberty is therefore a just punishment. The Supreme Court has noted probation is not "an act of leniency" but "a substantial restriction of freedom." *Gall*, 552 U.S. at 44. A probation sentence provides the Court with strong tools to punish Mr. Murray if he violates any of the conditions. Under 18 U.S.C. § 3565(a)(2), when a defendant violates a condition of probation, the Court may either treat the violation like a supervised release revocation, or revoke probation and resentence the defendant anew on the underlying criminal charge, including to a term of imprisonment followed by supervised release. *See United States v. Vasquez*, 160 F.3d 1237, 1238 (9th Cir. 1998). Requiring Mr. Murray report to the probation office for five years (instead of only three years if given a custodial sentence) ensures he is not only punished for his actions—with the threat of a potential custodial sentence hanging over his head if he violates any probation conditions—but also intensely supervised for a longer period by the Probation Office. The same is true if the Court defers sentencing for six months, which requires him to continue to be supervised by Pretrial Services, abide by the strict conditions of the halfway house, and then appear again for

sentencing.

Additionally, the "real conduct and circumstances" in this case must also account for Mr. Murray's traumatic upbringing. As he writes in his letter, "although my household was loving and caring, the neighborhood and apartments that I lived in were not," and he "was exposed to violence at an incredibly young age." Exh. A. Trauma during childhood creates higher risks for negative outcomes in life, including health and life opportunities.[2] As one Cornell University sociologist told the *New York Times,* trauma is a major factor "that shapes addictive and criminal behavior in adulthood" and is a "huge factor within the criminal justice system."[3] A doctor with the Centers for Disease Control elaborated, "children's adverse experiences are a public health problem" as "childhood adversity and stress can chemically change the way our brains work."[4]

That has been the story of Mr. Murray's life. The government highlights the "dramatically increased public safety threat the Oakland community has suffered from increased gun violence over the past year" as a reason to send Mr. Murray to prison. *See* Dkt. 42, United States' Sentencing Memorandum at 5. But Mr. Murray has been a victim of that violence himself, as it took his brother, normalized what should be violent shocking events, and took Mr. Murray into juvenile hall and jail.

Placing Mr. Murray on probation, or alternatively deferring sentencing for six months, punishes Mr. Murray for his crime but takes these factors into account.

**B.     Deterring Criminal Conduct and Protecting the Public.**

A custodial sentence is not needed to convince Mr. Murray not to commit another crime or to protect the public. Three months in jail and four months in the halfway house has been the wakeup call Mr. Murray needed to turn his life around.

**1.     Prosecuting this case in federal court serves as general deterrence.**

As for general deterrence, the mere fact that he was prosecuted in federal court and faces a

---

[2] *See* Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it.

[3] Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, *available at* https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html.

[4] *Id*.

harsher sentence—and more intensive supervision—than he would have received in state court for the same conduct is enough to deter other young felons from possessing firearms.

The primary consequence of the federal government's decision to prosecute Mr. Murray for a firearms offense is the likelihood of a significantly longer prison sentence than if he were prosecuted for the same crime in state court. Firearm offenses make up twice as many of the cases sentenced in the Northern District of California (20.2%) compared to federal courts nationally (11.1%). *See* Exh. C, U.S. Sentencing Commission Statistical Information Packet ("FY 2019 USSC NDCA Info Packet"), Fiscal Year 2019, Northern District of California, Figure A, Federal Offenders by Type of Crime.[5] Had Mr. Murray been prosecuted in state court, he could have received a probation sentence with no more than 365 days in the county jail as a condition, or been sentenced to state prison for either 16 months, 2 years, or 3 years likely with half time credits. *See* California Penal Code § 1170(h)(1). But the federal government's decision to prosecute him results in an advisory Guideline range between 46-57 months, significantly higher than the statutory maximum sentence in California state court for the same crime.

### 2. Mr. Murray's post offense rehabilitation demonstrates he has been deterred.

Turning to specific deterrence, the Court can consider "post-crime maturation and self-rehabilitation" at sentencing. *See United States v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentencing or post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct—[is] a *critical factor* to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59 (emphasis added)). Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492 (quoting 18 U.S.C. § 3553(a)(1)).

Mr. Murray has certainly matured because of this case. As he writes in his letter, "being given

---

[5] The full statistical information packet is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/can19.pdf.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Murray, Jr.*, 4:21-CR-00032-HSG

7

the chance to be in this halfway house has gave me a real spark of reality, especially awaiting to be sentenced in a federal jail for who knows how long. I have realized its way much more to life than I thought." Exh. A. As Mr. Murray left Oakland, got married, and found a job, he has a renewed sense of purpose and is eager to salvage a productive and law-abiding life.

A study published in the *Federal Probation* journal noted empirical evidence corroborating "the importance of defendants' success on pretrial services supervision as a harbinger of improved outcomes in subsequent stages of the criminal justice system" including "reduced failures during post-conviction supervision."[6] Mr. Murray has demonstrated he can comply with rules, take advantage of programming opportunities provided by the Court, and obtain a rewarding job. He should be given the opportunity to continue these positive strides rather than be incarcerated.

     **3.**     **Two judges have already determined Mr. Murray is not a danger to the public.**

As for the need to protect the public, when Judge Davila affirmed Judge Kim's release order in January 2021, he necessarily agreed with her assertion that Mr. Murray was not a danger to the community provided he remained out of Oakland and under the watchful eye of Pretrial Services and the halfway house.

The Bail Reform Act mandates release of a person pending trial unless the Court finds the person a flight risk or a danger to the community. 18 U.S.C. § 3142(b). The government bears the burden of proving by clear and convincing evidence that a defendant poses a flight risk or danger to the community that cannot be mitigated through conditions of release. It failed to do so twice before two different judges in this case, and nothing that has happened in the four months he has been on pretrial release warrants reconsideration. In fact, given his compliance with the release conditions and the rules of the halfway house, his desire to work and educate himself, and his ability to refrain from using marijuana, whatever danger he posed at the time of his arrest and initial appearance in federal

---

[6] Baber, et al., "A Viable Alternative? Alternatives to Incarceration Across Seven Federal Districts," *Federal Probation* Vol. 83, no. 1, p. 8 (Jun 2019), available at https://www.uscourts.gov/sites/default/files/83_1_2_0.pdf. The study, which reviewed seven different alternatives to incarceration courts—including this District's former Conviction Alternatives Program ("CAP")—concluded that participating in programs like CAP "is associated with improved outcomes, such as increases in employment and fewer positive drug tests, and among successful participants, a lower probability of arrest." *Id.* at 14.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Murray, Jr.*, 4:21-CR-00032-HSG

court is even further reduced.

## C. Providing Training, Medical Care or Other Treatment.

The "purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)). Mr. Murray does not need substance abuse treatment, though he is not opposed to a mental health assessment as recommended by the Probation Office, to determine whether he needs professional help processing the violence he witnesses as a child. PSR Sentencing Rec. at 4, ¶ 3.

Mr. Murray also believes he would benefit from programming oriented towards helping him make better, more productive decisions in his life. Placing him on probation with a condition he participate in cognitive behavioral therapy or, alternatively, deferring sentencing for six months with directions for Mr. Murray to participate in the Court's Courage to Change program, would be more effective at helping him make better decisions in the future rather than sending him back to custody to be around the same people that have been negative influences in his life.

## D. The Guidelines Sentencing Range.

The base offense level is 20 under U.S.S.G. § 2K2.1(a)(4)(B)(i)(I) because one of the firearms had a high-capacity magazine. *See* PSR ¶ 24. Because Mr. Murray possessed three firearms, another two levels are added under U.S.S.G. § 2K2.1(b)(1)(A). By waiving indictment and pleading guilty, Mr. Murray is entitled to a three-level downward adjustment for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b). PSR ¶¶ 31-32. The adjusted offense level is therefore 19. PSR ¶ 33. Mr. Murray is in criminal history category IV. PSR ¶ 42. So, the advisory Guideline range is 46-57 months. PSR ¶ 89.

But as this Court knows, the Supreme Court has made clear that the ranges recommended by the Sentencing Guidelines are neither mandatory nor presumptively reasonable. Instead, at sentencing courts have an "overarching duty" to "'impose a sentence sufficient, but not greater than necessary'" to comply with the sentencing factors in 18 U.S.C. § 3553(a). *Pepper*, 562 U.S. at 491 (quoting § 3553(a)). This Guideline range only considers the aggravating factors in Mr. Murray's case. But it fails to account for the mitigating factors in this case.

First and foremost, Mr. Murray's post-offense rehabilitation demonstrates he has been sufficiently deterred and does not need a custodial sentence as detailed above.

But another reason for a variance from the Guideline range is Mr. Murray's young age. He just turned 23 years old on May 25 of this year and was 22 years old when he committed the crime that brings him before the Court for sentencing. For federal defendants generally, and firearm offenders specifically, that is young. Defendants between the ages of 21 to 25 made up only 12.6% of all federal defendants sentenced in fiscal year 2020, and 16.2% of all firearms offenders, which includes defendants whose primary Guideline section is U.S.S.G. § 2K2.1. *See* Exh. D, U.S. Sentencing Commission 2020 Sourcebook of Federal Sentencing Statistics ("2020 USSC Sourcebook") Table 7, Age of Offenders by Type of Crime."[7]

The Sentencing Commission recognizes that a defendant's young age is a relevant sentencing consideration. The Guidelines note that "age (including youth)" is a relevant sentencing consideration "individually or in combination with other offender characteristics, [when] present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1. The Sentencing Commission has also recognized neurological research that shows brain development is not fully realized in most people until they turn 25 years old. Researchers have found that the prefrontal cortex of the brain—which "is utilized in impulse control, emotional reactions, executive function and decision making"—is the last part of the brain to develop. It "is not complete by the age of 18…development continues into the 20s" and "most researchers reference 25 as the average age at which full development has taken place."[8]

In other words, research shows that the brain of a defendant like Mr. Murray who commits a crime at the age of 22 is closer to the brain of a 16 or 17-year-old juvenile, than to the brain of most defendants convicted of firearms offenses, for whom the average age was 34, and 75% of whom were between the ages of 26 and 50 in fiscal year 2020. *See* Exh. D; Exh. E, 2020 USSC Sourcebook Table

---

[7] The entire sourcebook is available online at https://www.ussc.gov/research/sourcebook-2020.

[8] *See* U.S. Sentencing Commission, "Youthful Offenders in the Federal System," May 2017, at 6, 7, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Murray, Jr.*, 4:21-CR-00032-HSG
10

F-3, Age of Firearms Offenders. Mr. Murray's young age supports a variance from the Guidelines range.

E. **Avoiding Unwarranted Sentencing Disparities.**

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted similarities among [defendants] who were not similarly situated.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall,* 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6). Placing Mr. Murray on probation, or deferring sentencing for six months, ensures Mr. Murray is not equated with a defendant who brandished a firearm during a crime of violence or drug trafficking crime.

Nor would such a variance from the Sentencing Guideline range lead to unwarranted sentencing disparity. Nationally, almost 40% of all defendants sentenced under U.S.S.G. § 2K2.1 received a downward variance in fiscal year 2020, a significantly higher number than the overall downward variance rate of 24.5%. *See* Exh. F, 2020 USSC Sourcebook Table F-6, Sentence Imposed Relative to the Guideline Range for Firearms Offenders; Exh. G, 2020 USSC Sourcebook Table 29, Sentence Imposed Relative to the Guideline Range. The variance rate for firearm offenders is even greater in the Northern District of California, where the most recent Sentencing Commission data for the District reveals a 44% overall variance rate for firearm offenders. *See* Exh. H, FY 2019 USSC NDCA Info Packet, Table 10, Sentence Imposed Relative to the Guideline Range by Type of Crime.

More specific to the Northern District, many defendants charged with being a felon in possession of a firearm, and other firearm and drug offenses—including many with more aggravated criminal records, higher Guideline ranges, and less time in pretrial custody—have received non-custodial sentences in this District, including probation or deferred sentencing. Some of those defendants completed the Court's CAP or ATIP programs. But not all. Many were released from custody onto Pretrial Services supervision, allowed to participate in programming and although not in CAP or ATIP, nonetheless given the opportunity to demonstrate they did not need a prison sentence to be law-abiding members of society.

| Name | Case No. | Charge(s) | USSG Range | Sentence | Pretrial Custody |
|---|---|---|---|---|---|
| J.A. | 16-141-HSG-(JST) | Felon in possession; drug sales | 151-188 | 5 years probation after graduating CAP | 2 weeks |
| J.A. | 18-402-WHO-(EMC) | Felon in possession | 37-46 | 5 years probation after graduating CAP | 6 weeks |
| J.B. | 19-258-PJH | Felon in possession | 33-41 | 5 years probation | 7 days |
| O.C. | 15-438-RS | Felon in possession | 30-37 | 5 years probation | 14 days |
| A.C. | 16-511-VC | Felon in possession (2 counts) | 168-210 | 5 years probation | 6 days |
| D.D. | 19-688-WHO | Felon in possession | 30-37 | Time served | 5 months |
| S.E. | 14-43-JST | Felon in possession | 37-46 | 5 years probation | 1 month |
| D.F. | 18-555-HSG-(WHA) | Felon in possession | 27-33 | Time served after graduating CAP | 1 month |
| I.F. | 16-514-HSG-(JST) | Felon in possession; drug sales | 140-175 | 5 years probation after graduating CAP | One month |
| K.F. | 20-240-EMC | Felon in possession | 27-33 | 5 years probation | 5 days |
| W.G. | 18-40-HSG-(JST) | Felon in possession | 33-41 | 4 years probation after graduating CAP | 5 days |
| D.G. | 15-81-EJD-(BLF) | Felon in possession | 46-57 | 5 years probation after graduating CAP | 2 weeks |
| J.G. | 18-403-HSG-(WHA) | Felon in possession | 30-37 | Time served after graduating ATIP | 1 month |
| D.G. | 17-20-CRB | Felon in possession | 46-57 | Time served after sentencing deferred 1 year | 1 day |
| J.H. | 19-391-HSG | Felon in possession | 37-46 | Sentencing deferred 1 year | 4 months |
| T.I. | 16-33-VC | Felon in possession | 46-57 | 5 years probation | 8 months |
| C.J. | 16-421-CRB | Felon in possession | 15-21 | Time served after sentencing deferred 1 year | 2 days |
| V.L. | 14-632-JD | Felon in possession | 27-33 | 5 years probation after sentencing deferred 6 months | 4 days |
| E.M. | 16-209-YGR | Drug sales (4 counts) | 57-71 | 5 years probation after sentencing deferred 9 months | 5 days |
| M.M. | 18-404-CRB | Drug sales; illegal gun possession | 97-121 | Time served after graduating CAP | 7 days |
| A.M. | 18-416-JD | Felon in possession | 37-46 | Time served after sentencing deferred 6 months | 3 weeks |
| A.M. | 19-78-JST | Felon in possession | 37-46 | Sentencing deferred 10 months | 3 days |
| P.N. | 18-521-HSG-(YGR) | Possess unregistered firearm | 24-30 | Time served after graduating ATIP | 2 months |
| Q.N. | 14-636-EJD-(TEH) | Felon in possession | 100-125 | 5 years probation after graduating CAP | 3 days |
| T.R. | 18-394-HSG-(JST) | Drug & gun sales | 108-135 | 5 years probation after graduating ATIP | 10 days |
| I.S. | 18-346-JD | Drug sales | 70-87 | Time served | 1 day |

| R.S. | 17-256-JD | Felon in possession | 30-37 | Time served after sentencing deferred 1 year | 3 days |
| G.T. | 19-363-YGR | Felon in possession | 51-63 | Referred to ATIP | 2 months |

Mr. Murray has precisely done that. Placing him on probation or, alternatively deferring sentencing for six months, would thus be consistent with other defendants in the District facing comparable (and higher) advisory Guideline ranges who have done the same.

### F. Mr. Murray Does Not Have the Means to Pay a Fine.

Mr. Murray objects to the Probation Office's recommendation that Mr. Murray be ordered to pay a $2,500 fine. PSR Sentencing Recommendation at 1. The government is not requesting a fine.

In determining whether to impose a fine, Congress has required district courts to consider not only the factors detailed in 18 U.S.C. § 3553, but also:

> (1) the defendant's income, earning capacity, and financial resources;
>
> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
>
> (3) any pecuniary loss inflicted upon others as a result of the offense;
>
> (4) whether restitution is ordered or made and the amount of such restitution;
>
> (5) the need to deprive the defendant of illegally obtained gains from the offense;
>
> (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; and
>
> (7) whether the defendant can pass on to consumers or other persons the expense of the fine.

18 U.S.C. § 3572.

The Sentencing Guidelines also direct district courts to consider several factors in determining whether to impose a fine, including

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

      (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

      (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;

      (4) any restitution or reparation that the defendant has made or is obligated to make;

      (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

      (6) whether the defendant previously has been fined for a similar offense;

      (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

      (8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). If a defendant can demonstrate "he is unable to pay and is not likely to become able to pay any fine," the district court can waive the fine. U.S.S.G. §§ 5E1.2(a), (e).

      Considering these factors, it is clear Mr. Murray has established he is unable to pay and is not likely to become able to pay any fine. *See* U.S.S.G. § 5E1.2(a). Importantly, upon his initial appearance in federal court, Judge Kim deemed Mr. Murray "indigent" and appointed counsel to represent him. *See* Dkt. 4. To find Mr. Murray indigent, Judge Kim determined his "net financial resources and income are insufficient to obtain qualified counsel," after considering "the cost of providing the person and his dependents with the necessities of life." *See* 7A Guide to Judiciary Policy § 210.40.30. The Sentencing Commission explains the "fact that a defendant is represented by (or was determined eligible for) assigned counsel are *significant* indicators of present inability to pay any fine," and "may also indicate that the defendant is not likely to become able to pay any fine." U.S.S.G. § 5E1.2 app. n. 3 (emphasis added); *see also United States v. Robinson*, 20 F.3d 1030, 1033 (9th Cir. 1994).

      As amply documented in the PSR itself, Mr. Murray has no ability to pay a fine. He owns no property or cars, has less than $700 in his checking accounts, and a negative net worth. PSR ¶ 85. It appears the probation office determined he could pay a fine because Mr. Murray has a positive cash flow because he is working and earning $18.51 an hour, while also having very little monthly living

expenses as he lives in the halfway house. PSR ¶ 81. But Mr. Murray only started the job and does not always work every day. Moreover, any income Mr. Murray earns will also be put towards tuition, costs associated with starting his own business, contributing subsistence payments to the halfway house, and eventually shared living expenses when he eventually leaves the halfway house and lives with Terrell in Stockton.

Because Mr. Murray has demonstrated "he is unable to pay and is not likely to become able to pay," and because the government itself is not requesting a fine, none should be imposed in this case. U.S.S.G. §§ 5E1.2(a), (e).

## CONCLUSION

Mr. Murray has learned his lesson and does not need a custodial sentence to convince him to never pick up a firearm again. He respectfully requests this Court sentence him to five years of probation or, alternatively, defer sentencing for six months to allow him to continue with the positive strides he has made.

Dated: June 30, 2021

Respectfully submitted,

MOEEL LAH FAKHOURY LLP

Hanni M. Fakhoury
Attorneys for Donald Murray, Jr.